**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

| | |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>JAMES WILLIAM THOMAS, III,<br>Defendant. | Case No.: 2:18-cr-58 |

# REPORT AND RECOMMENDATION

Before the Court is Defendant James William Thomas, III's ("Defendant") First Motion to Suppress filed on August 1, 2018. ECF No. 16. This matter was referred to the undersigned United States Magistrate Judge ("the undersigned") for a Report and Recommendation pursuant to a Referral Order from the United States District Judge. ECF No. 20; *see also* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); E.D. Va. Local Civ. R. 72. Subsequently, on November 14, 2018, the Court held a hearing on Defendant's First Motion to Suppress. For the following reasons, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress, ECF No. 16, be **GRANTED IN PART** and **DENIED IN PART**.

## I. PROCEDURAL BACKGROUND

The Defendant is currently charged with eight counts of production of child pornography, in violation of 18 U.S.C. §§ 2251(a) and 2, and three counts of possession of child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B). ECF No. 1. Defendant's case was deemed complex and Defendant's trial was scheduled for September 25, 2018. Defendant filed a Motion to Extend the Date to File Pre-Trial Motions, ECF No. 14, which the Court granted with a new motions

deadline of August 1, 2018, ECF No. 15.

On August 1, 2018, Defendant filed his First Motion to Suppress.[1] ECF No. 16. The Government filed its Response to Defendant's Motion to Suppress on August 15, 2018. ECF No. 19. Defendant did not submit a reply brief. On August 17, 2018, the District Judge issued an Order referring the suppression motion to the undersigned for a report and recommendation, ECF No. 20, and the matter was set for hearing on August 27, 2018. On August 23, 2018, defense counsel filed a Motion to Withdraw, ECF No. 21, which the Court took up at the August 27, 2018 hearing. ECF No. 23. Following the Defendant's sworn testimony and the proffer and arguments of counsel, the Court granted the Motion to Withdraw. ECF Nos. 23-24. The Court deferred argument on the Motion to Suppress due to the replacement of counsel, and the District Judge subsequently directed new counsel to file a status report indicating whether Defendant wished to proceed to a hearing on the pending Motion to Suppress, and whether he intended to adopt, supplement, or withdraw the briefing previously filed in support of that motion. ECF No. 26.

New counsel filed a status report adopting the First Motion to Suppress and the arguments therein, seeking leave to file supplemental briefing, and requesting to continue the suppression hearing and trial dates. ECF No. 27. The Court entered an Order granting Defendant's request to file supplemental briefing on the Motion to Suppress to be filed no later than September 27, 2018. ECF No. 29. Defendant moved for an Extension of Time for Supplemental Memorandum, ECF No. 30, and the Court granted an extension to October 12, 2018, ECF No. 32. Defendant filed his Supplemental Brief in Support of Motion to Suppress on October 12, 2018. ECF No. 33. On October 26, 2018, the Government filed its Supplemental Response to Defendant's Motion to

[1] While this Motion is captioned "First Motion to Suppress" it is the only suppression motion that has been filed by Defendant.

Suppress. ECF No. 37. A suppression hearing was scheduled for November 14, 2018.

Thereafter, on November 5, 2018, new counsel filed a Motion to Withdraw. ECF No. 38. The Court entered an Order directing counsel for Defendant and counsel for the Government to address the Motion to Withdraw and, pending the outcome of that motion, be prepared to proceed with the Motion to Suppress at the November 14, 2018 hearing. ECF No. 42. At the hearing on November 14, 2018, the Court orally denied the Motion to Withdraw and the parties proceeded to present evidence and argument on the Motion to Suppress. ECF No. 45. At the hearing, FBI Special Agent David Desy ("Special Agent Desy"), Southampton County Sheriff's Office Detective Scott Griffith ("Det. Griffith"), and Southampton County Sheriff's Office Detective Lieutenant Camden Cobb ("Lt. Cobb") testified, and the Court took the suppression motion under advisement. *Id.* Following the hearing, the Court entered an Order denying in writing the Motion to Withdraw. ECF No. 46. As such, Defendant's First Motion to Suppress, ECF No. 16, is now ripe for recommended disposition.

## II. FACTUAL BACKGROUND

In 2014 the Southampton County Sheriff's Office began investigating a number of burglaries that occurred in Southampton County. ECF No. 51 at 55. Members of the Southampton County Sheriff's Office soon noticed similarities between these crimes. *Id.* These similarities include the geographical proximity of the burglaries, the types of homes that appeared to be targeted, and the types of items that were stolen. *Id.* at 55-56. There were "three burglaries on the same road and a fourth burglary in the same area in the span of approximately 12 months." *Id.* at 123. Most of the Southampton County homes targeted were not primary residences and were used mainly as second homes, weekend homes, or seasonal residences. *Id.* at 56, 58. The items taken

ranged from typical targets of burglary—high value and easily transportable items such as televisions, electronics, cash, and firearms—to very odd unusual items that were "[l]arge, cumbersome, low-value items, or low value for the effort, and miniscule, small, low-value household items" such as refrigerators and toiletries; to police "it seemed like everything was taken." *Id.* at 56-59.

Noticing a pattern, the Sheriff's Office speculated that the same person or persons were likely responsible for all the burglaries with these characteristics. *Id.* Lt. Cobb, a then-detective with the Southampton County Sheriff's Office who investigated these burglaries, testified that "In the very beginning, there were three that we believed to be connected; one from, I believe, January of 2014, another from February of 2014. And those happening in back-to-back months, we began looking further back and found another from the fall or winter of 2013, also the same basic geographic area of the county and the same types of items and the same type of residence, being it was not a primary residence." *Id.* at 58.

In February 2014, Robert Clarke's home, a secondary residence, was burglarized in a manner consistent with earlier burglaries. *Id.* at 59, 123. Clarke spoke to Lt. Cobb the day of the burglary and "mentioned a white male that drove a white pickup truck that drove by his house very regularly" and said he suspected that this was the person who committed the burglary of his home. *Id.* at 60. Clarke further stated that he thought "the individual . . . lived [on Little Texas Road] around the corner from his home . . . [in] a trailer on the right where that white truck would regularly be." *Id.* Lt. Cobb visited the trailer on two or three occasions to conduct a knock-and-talk. *Id.* at 60, 129. Lt. Cobb knocked without response and left his business card on the door. *Id.* at 61. Other officers with the Southampton County Sheriff's Office were familiar with Defendant,

knew he had previously been convicted of burglary, and knew he lived in the trailer. *Id.* at 62, 64. Using the address, Lt. Cobb confirmed Defendant was an occupant of the trailer through DMV records. *Id.* at 61, 64. Following the initial interview, Clarke emailed Lt. Cobb a list of thirty-eight items he believed were stolen, including "some SD cards, binoculars, telescopes, things of that nature" as well as "paper towels, granola bars, canned foods, [and] Pop Tarts." *Id.* at 65, 67.

On or about April 27, 2014, a coin shop and attorney's office, connected by a shared restroom, were burglarized in the nearby city of Franklin. *Id.* at 68, 91. The burglar gained access by creating a hole on the roof of the attorney's office. *Id.* at 91. The attorney "paid a retired Franklin police officer to sit in his building overnight following the initial break-in, in case the individual who had made the hole in the roof came back." *Id.* The burglar returned that night, the Franklin police were called, and the burglar—later identified as the Defendant—was arrested. *Id.* at 68, 91. Incident to his arrest, the Franklin Police recovered some new DeWalt brand tools that were consistent with tools Clarke had reported as stolen from his home two months earlier. *Id.* at 68-69. Clarke had told Lt. Cobb that he writes his name on his tools and Franklin Police confirmed that Clarke's name appeared on the battery of a drill recovered incident to Defendant's arrest. *Id.* at 69. Several other tools stolen from Clarke's residence were also recovered.[2] *Id.*

On April 28, 2014, following Defendant's arrest and based on the information known at the time, Lt. Cobb wrote an affidavit for a search warrant of Defendant's residence on Little Texas Road and a search warrant was issued. *Id.* at 71. The affidavit supporting the search warrant of

[2] Lt. Cobb testified he was unsure whether some of the tools were recovered from Defendant's person upon his arrest or following his arrest from the vehicle he had driven to the attorney's office and coin shop. ECF No. 51 at 68, 70. Later, however, Lt. Cobb stated that he believed both a DeWalt drill and Stihl saw were seized pursuant to the search warrant obtained by Franklin Police for Defendant's vehicle. *Id.* at 140-41. This vehicle was a white Dodge pickup truck and is a different vehicle from the white Chevrolet pickup truck parked at Defendant's residence discussed *infra*. *Id.* at 141-42.

Defendant's home is as follows:

> 1. A search is requested in relation to . . . [f]elony burglary, 18.2-91 and felony larceny, 18.2-95 of the Code of Virginia, 1950 as amended.
>
> 2. The place to be searched . . . the residence at . . . Little Texas Road, Branchville, Virginia 23828 in Southampton County and the curtilage thereof to include any outbuildings, and any vehicles in the yard. The residence is further described as a tan colored, single-wide mobile home with white skirting and a wooden front porch, not covered. There is one mailbox in front of the house with the numbers . . . clearly visible.
>
> 3. The things or persons to be searched for are . . . [a]ny and all items and evidence related to the crimes of larceny and burglary, to include but not limited to, cash, televisions and other electronic devices, power tools, outdoor equipment, chainsaws, firearms, ammunition, bows, binoculars, rods and reels, game cameras, various types of hunting equipment and sporting goods, camouflage clothing and household goods, and any and all similar items.
>
> 4. The material facts constituting probable cause what the search should be made are[] [that] James William Thomas III . . . was arrested by Franklin Police Department in the act of breaking into a business in the City of Franklin. A search warrant was issued for his vehicle and items were recovered. One of the items was a power drill that matched the description of a stolen item for a residence that was broken into in the vicinity of . . . Little Texas Road. The power tool had the victim of that break-in's name written on the battery, concealed from plain view, written in black marker, appearing as 'Bobby Clarke'. Clarke has previously reported that his name was written on various items that were stolen from his residence in February of 2014. Another item recovered, a Stihl MS211 chainsaw with the serial number . . . was identified as belonging to Bobby Clarke through a record of purchase histories maintained by Stihl. Other similar items were recovered by Franklin Police Department that are still in the process of determining their origin and rightful ownership.

ECF No. 16, attach. 1; *see also* ECF No. 51 at 72-75. The search warrant that was issued authorized officers to search:

> [T]he residence at . . . Little Texas Road, Branchville, Virginia 23828 in Southampton County and the curtilage thereof to include any outbuildings, and any vehicles in the yard. The residence is further described as a tan colored, single-wide mobile home with white skirting and a wooden front porch, not covered. There is one mailbox in front of the house with the numbers . . . clearly visible[.]

ECF No. 16, attach. 1. The search was permitted for the following property:

> Any and all items and evidence related to the crime of Larceny and Burglary, to include but not limited to cash, televisions and other electronic devices, power tools, outdoor equipment, chainsaw's [sic], firearms, bows, binoculars, rods and reels, game cameras, various types of hunting equipment and sporting goods, camouflage clothing and household goods and any and all similar items[.]

*Id.*

Lt. Cobb, along with other employees of the Southampton County Sheriff's Office (the "Sheriff's Office"), executed the search warrant. ECF No. 51 at 75-76. The Sheriff's Office searched a white Chevrolet pickup truck parked in the backyard behind Defendant's residence. *Id.* at 83. Almost every burglary had gas cans stolen and the Sheriff's Office found "a lot of gas cans" in the bed of the Chevrolet truck as well as outside on the ground, and several in the trailer. *Id.* at 83. The Sheriff's Office also determined the truck itself was stolen. *Id.* at 84. The inside of the home had "a lot of random items, a lot of piles of items, trash, cat feces, dirty dishes[;] . . . very similar to what the outside looked like." *Id.* at 78. Lt. Cobb testified that the situation "rapidly developed" and he and his co-workers "began with the items that we immediately knew were going to be evidence of a crime," including firearms, due to Defendant's status as a felon. *Id.* The Sheriff's Office then "began to identify the items . . . believed would have been stolen from the burglaries . . . [a]nd very quickly, upon starting to inventory the items . . . believed to be stolen, [they] started to find evidence of other burglaries and break-ins, and that information was fairly quickly verified." *Id.* at 76. Lt. Cobb recovered a litany of items:

> All of the types for the burglaries that we were already investigating. Some items were very specific, such as a 1,000-piece cabin puzzle, which . . . would be a relatively generic, unidentifiable item, but when I find the cabin puzzle and then -- from specifically Robert Clarke's break-in, as well as three firearms belonging to him, a bow and arrow, DeWalt tools with his name on them. It seems unlikely that that 1,000-piece puzzle would have just been another puzzle that would have been

> in the house. So everything from the guns all the way down to the common odd items to be stolen were located.

*Id.* at 80. The refrigerator and a garbage can, inside the residence, and which appeared to be in use by Defendant, were also both stolen, as these items had the names of the owners written on them. *Id.* at 82-84, 92. The Sheriff's Office concluded that

> Everything that appeared to be of a newer, nicer item, quality item, anything that wasn't broken or damaged, it all -- almost everything that we picked up, looked at, identified, we were finding where it belonged to some other individuals that had reported those items as stolen, either from our county or a surrounding jurisdiction, and we realized more likely than not these other items that were in the home were going to be identified as belonging to somebody else at some point, that we just didn't know who at that time.

*Id.* at 95-96. Execution of the search warrant took "the better part of three days." *Id.* at 98. The Sheriff's Office followed up with a second search warrant "to try to find any other items that might be related to this large, at that time, eight-year spree of burglaries" and to comply with the 72-hour limit on completing execution of the first search warrant. *Id.* at 98-99. This second warrant was identical to the first, except that the probable cause statement adds that "other victims had come forward and identified items of similar description," there was "[a]n unknown amount of possible victims," "mention of the storm that was approaching the location," and stated that the Sheriff's Office had not yet had an opportunity to "go[] through [a] pile of garbage." *Id.* at 100-01. Execution of the second warrant took only one day and the Sheriff's Office recovered more items identified as stolen. *Id.* at 101-02.

During the search, Lt. Cobb saw and went through several notebooks, legal pads, and papers (hereinafter "Notebooks"). *Id.* at 169. Lt. Cobb noticed one "notebook in particular had something on the front or the top page, and [he] just began to look through the notebooks."[3] *Id.* at

[3] Lt. Cobb testified "I don't recall which notebook in particular had something on the front or the top page, and I just

170. "[O]n one of the legal pads . . . there was like some lists, like preparation . . . preparation for burglary . . . entitled "Ops Plan" and other potentially incriminating writings. *Id.* at 169.

The Southampton Sheriff's Office seized all items they believed were stolen and transported them to a secured location. *Id.* at 40, 80-81. The evidence seized was organized by the particular crime or victim and "items in the center were at that time yet-to-be-identified items" that the Sheriff's Office "could not at that time put . . . to a particular victim of a crime." *Id.* at 81. Ultimately, items seized from Defendant's home were connected to more than twenty burglaries in addition to various incidents of larceny dating back as early as 2006. *Id.* at 76, 96.

Of note, the Sheriff's Office seized "at least ten" electronic devices, including "PC towers, computer monitors, flash drives, SD cards, external hard drives, and . . . two, possibly three, laptops." *Id.* at 104. To determine who these items belonged to, the Sheriff's Office first looked to see if the exterior of the devices had identifying information. *See Id.* at 105-06 (indicating two of the computers had the victims' name or initials on the exterior). For those without identifying information readily available, the Sheriff's Office contacted the manufacturers of the electronics. *Id.* at 107. "[Dell Computer's] customer service department was able to identify the service tag on one of the laptops recovered" and identify the original purchaser—the victim of a break-in. *Id.* Other electronics were identified by serial numbers and some were identified by the original owner

began to look through the notebooks." ECF No. 51 at 169. Lt. Cobb further stated, "I don't recall what was on the top page of any of the notebooks that caused me to start to flip through them." *Id.* Lt. Cobb testified that he was looking specifically for incriminating writings and believed that this fell "under that evidence of burglary and larceny from the warrant." *Id.* at 169-71. Relatedly, Lt. Cobb stated, "I remember there were several notebooks. I believe there were some that was just sheets of paper, not necessarily a notebook, some legal pads, and possibly even like a spiral-bound type notebook. Just there were multiple, and I do recall while flipping through them -- I know that on one of the legal pads, I believe it was, there was like some lists, like preparation, is what it seemed like, that listed -- and I wouldn't want to try to mention the specific items. It was things that caught my interest in terms of, it appeared to me, preparation for burglary. I think it might have even been entitled "Ops Plan," things like that." *Id.* at 169.

in person and released after ownership was verified. *Id.* at 107-08. The Sheriff's Office did not access or otherwise turn on any of the computers seized from Defendant's home, but for a pink dell laptop. *Id.* at 144. Despite these efforts the Sheriff's Office was left with "multiple storage devices that were not computers -- so SD cards and flash drives and an external hard drive." *Id.* at 108. For those still-unidentified electronics Lt. Cobb "accessed the devices directly from [his] computer to try to find anything on the device that would link it to an individual to determine who the rightful owner was." *Id.* at 109. Lt. Cobb was looking for "[p]redominantly, pictures of individuals that would show" the owner; and that method was successful in at least two instances. *Id.* at 41, 109-110, 145.

On May 30, 2014, Lt. Cobb reviewed the contents of an Iomega hard drive which revealed what appeared to be evidence of child pornography.[4] *Id.* at 111-13, 115. Lt. Cobb also accessed a thumb drive on May 30, 2014, which revealed similar evidence. *Id.* at 116. A later review of the hard drive by Detective Griffith ("Det. Griffith") sometime between June 2 and 4, 2014, revealed evidence of a similar type. *Id.* at 41, 44, 115-16. On June 4, 2014, Lt. Cobb spoke with FBI Special Agent Jack Moughan[5] ("Special Agent Moughan") regarding these files and did not access the hard drive or thumb drive after that date. *Id.* at 116-17.

Special Agent Moughan directed Lt. Cobb to get a warrant for the Defendant's cell phone, and he undertook the effort to obtain a warrant for the thumb and hard drives; Lt. Cobb did so on June 11, 2014. *Id.* at 118. Lt. Cobb secured the cell phone from Western Tidewater Regional Jail

[4] While the evidence discovered was discussed in limited fashion at the hearing and forms the basis for Defendant's instant charges, this is not the focus of the current inquiry nor is it necessary to determine whether Defendant's Fourth Amendment rights were violated.

[5] The transcript of the hearing for Defendant's Motion to Suppress identifies this agent as "Mohan," however, other evidence, such as the federal search warrant, ECF No. 16 attach. 2, and a supplemental report of the Sheriff's Office, *Id.* attach. 3, indicate the correct spelling for this FBI agent is Moughan. The latter spelling is reflected in the Court's recitation of the facts herein.

to be turned over to the FBI with the hard drive and thumb drive, but never accessed it. *Id.* at 117-18. These devices were turned over to the FBI for further investigation. *Id.* at 118. Lt. Cobb also turned over a computer. *Id.* at 119-120. This computer was believed to be stolen and was seized under the first search warrant but never accessed by the Sheriff's Office because its set-up made it appear that it was Defendant's own personal-use computer, unlike the other computers found in Defendant's home. *Id.* at 119-20, 131-32. The Sheriff's Office also did not turn on any of the other computers seized from Defendant's home except for a pink dell laptop.[6] *Id.* at 144.

The FBI sought a federal search warrant for the devices described above along with several other devices, and a search warrant was issued on July 18, 2014. ECF No. 16, attachs. 2, 7. The FBI found what it believed to be child pornography on three devices turned over to them: the Iomega hard drive, a Transcend white flash drive, and a Pavilion desktop computer. ECF No. 51 at 48. These devices were reviewed by Special Agent Desy. *Id.* at 50. Special Agent Desy reviewed the contents of the desktop computer, which had username initials "JT," presumably for James Thomas, the Defendant.[7] *Id.* at 53. While a flash drive was reported stolen by one of the burglary victims, law enforcement was never able to tie the flash drive, hard drive, or computer at issue to any burglary or theft victim. *Id.* at 51, 53, 137.

## III. ANALYSIS

The Fourth Amendment protects the "right of the people to be secure in their persons,

---

[6] It is unclear whether the Sheriff's Office exhausted all other efforts to identify owners of the electronics prior to accessing the contents therein. Testimony about the steps taken to identify those items imply that the contents of the electronics were not reviewed until all other efforts had been expended. *See* ECF No. 51 at 104-09. However, Lt. Cobb testified that the pink laptop was one of the computers that Dell Computers was able to provide the original purchaser's information for, but also states that this computer was turned on to try and identify the true owner and access was limited to the sign-in screen which had a login name "Brittany" and required a password. *Id.* at 144, 146.

[7] Special Agent Desy could not recall whether the Pavilion computer was password protected. *Id.* at 53.

houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. Whether the Fourth Amendment has been violated "is a question of fact to be determined from all the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 40 (1996). In the instant case, Defendant seeks to suppress numerous items found in Defendant's home that he alleges were searched and/or seized in violation of his Fourth Amendment rights, namely:

(1) electronic evidence found on the Iomega hard drive;

(2) electronic evidence found on the Transcend white flash drive;

(3) electronic evidence found on the Pavilion desktop computer; and

(4) evidence of Defendant's handwritten notes.

*See* ECF Nos. 16, 33. In support of Defendant's Motion to Suppress, Defendant raises several arguments:

(1) the warrant to search Defendant's home was overbroad and insufficiently particularized;

(2) Defendant's electronic devices were seized outside the scope of the search warrant of Defendant's home;

(3) The search and seizure of Defendant's Notebooks are outside the scope of the warrant and the plain view exception does not apply.

(4) The Sheriff's Office conducted a warrantless search of Defendant's electronic devices and no exception to the warrant requirement applies;

(5) Evidence obtained from Defendant's electronic devices pursuant to the federal search warrant is fruit of the poisonous tree; and therefore must be excluded.

*See* ECF Nos. 16, 33. The Government argues in response that:

(1)(a) the warrant to search Defendant's home was based on probable cause, was sufficiently particular, and was not overbroad; (1)(b) alternatively, if the Court finds the warrant deficient, then the good faith exception applies;

(2) Defendant's handwritten notes were located during a proper search of Defendant's home;

(3) Defendant lacks standing because he cannot demonstrate any of the electronic devices at issue belong to him;

(4) the search of the electronic devices was proper because the Sheriff's Office reasonably believed the devices were stolen and therefore were not infringing on Defendant's privacy rights by reviewing the contents.

A. <u>The Search Warrant for Defendant's Home was Neither Overbroad nor Insufficiently Particularized</u>

The Fourth Amendment provides that "no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "[P]robable cause is a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983). Therefore, a magistrate considering whether probable cause supports the issuance of a search warrant simply must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id.* at 238. For a magistrate to conclude that probable cause exists, a warrant application's supporting affidavit must be more than

conclusory and bare bones; indeed, the affidavit "must provide the magistrate with a substantial basis for determining the existence of probable cause." *Id.* at 239. Probable cause is not subject to a precise definition, and it is a relaxed standard. *See United States v. Allen*, 631 F.3d 164, 172 (4th Cir. 2011); *see also United States v. Martin*, 426 F.3d 68, 76 (2d Cir. 2005) (citing *United States v. Leon*, 468 U.S. 897, 958 (1984)). When examining an affidavit, a magistrate may rely on law enforcement officers who may "'draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person,'" as long as the affidavit contains facts to support the law enforcement officer's conclusions. *United States v. Johnson*, 599 F.3d 339, 343 (4th Cir. 2010) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)); *see also United States v. Brown*, 1992 U.S. App. LEXIS 1675, at *5 (4th Cir. 1992) (noting that "magistrates, in making probable cause determinations, may rely upon an experienced police officer's conclusions as to the likelihood that evidence exists and where it is located").

A court reviewing whether a magistrate correctly determined that probable cause exists should afford the magistrate's determination of probable cause great deference. *See Gates*, 462 U.S. at 236. Therefore, "the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing] that' probable cause existed." *Id.* at 238-39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)); *see also United States v. Blackwood*, 913 F.2d 139, 142 (4th Cir. 1990). A reviewing court should "resist the temptation to 'invalidate warrants by interpreting affidavits in a hypertechnical, rather than a commonsense, manner.'" *Blackwood*, 913 F.2d at 142 (quoting *Gates*, 462 U.S. at 236).

"'[S]earches conducted outside the judicial process, without prior approval by judge or

magistrate, are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions.'" *California v. Acevedo*, 500 U.S. 565, 580 (1991) (quoting *Mincey v. Arizona*, 437 U.S. 385, 390 (1978)). The Government bears the burden of demonstrating that an exception to the warrant requirement applies. *Coolidge v. New Hampshire*, 403 U.S. 443, 454-55 (1971). If the Government fails to carry its burden, the Court must suppress all evidence derived from the unconstitutional search. *See Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (articulating the fruit of the poisonous tree doctrine).

Defendant argues that the search warrant was "effectively a general warrant to rummage through [Defendant's] home" as there is no probable cause that evidence of additional stolen items belonging to Mr. Clarke would be found at the home . . . [and] no probable cause to support the search and seizure of any and all items related to the crimes of larceny and burglary." ECF No. 16 at 8. Defendant contends, that because the search warrant failed to identify the specific items to be seized, despite the fact that Lt. Cobb had a list of items that Clarke reported stolen, the warrant was overbroad since it did not constrain police from searching for items that had no relation to the Clarke burglary. *Id.* at 8-9.

The Government argues that the warrant did not lack particularity and was not overbroad because, while the search warrant does provide language permitting the search and seizure of any evidence related to larceny and burglary more generally, the warrant then specified the particular types of items that the Sheriff's Office was permitted to search for and seize under the warrant's authority. ECF No. 19 at 11. The Government argues that the Defendant is essentially asking the Court to take a hypertechnical approach to reviewing the search warrant that precedent has warned against. *Id.* at 12. Further, the Government contends that the probable cause statement signaled

Defendant's involvement in other burglaries when it stated "[o]ther similar items were recovered [pursuant to Defendant's arrest] . . . that we are still in the process of determining their origin and rightful ownership." The Government states that Defendant's argument that the probable cause supporting the search warrant extends only to Clarke's tools or, at most, only to the Clarke burglary is exceedingly narrow and should be rejected under a common-sense inquiry. *Id.* at 12-13.

The Court agrees with the Government to the extent that the Defendant appears to be asking the Court to take a hypertechnical view in determining the search warrant's validity. "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for . . . conclud[ing] that' probable cause existed." *Gates*, 462 U.S. at 238-39 (quoting *Jones*, 362 U.S. at 271); *see also Blackwood*, 913 F.2d at 142. Specifically, a reviewing court should "resist the temptation to 'invalidate warrants by interpreting affidavits in a hypertechnical, rather than a commonsense, manner.'" *Blackwood*, 913 F.2d at 142 (quoting *Gates*, 462 U.S. at 236). The Court shall address Defendant's arguments and the Government's responses in light of this cautionary instruction.

Defendant takes issue with the language "The things or persons to be searched for are . . . [a]ny and all items and evidence related to the crimes of larceny and burglary," which Defendant argues is unconstitutionally overbroad. ECF No. 16 at 8. Instructive on this issue is *United States v. Dickerson*, in which the Fourth Circuit scrutinized a warrant's constitutionality where the items to be seized were limited and defined only by the type of crime that allegedly occurred. 166 F.3d 667, 696, *reversed in part on other grounds*, 530 U.S. 428 (2000) (finding a search warrant that limited the search to evidence if a specific type of crime, bank robbery, was sufficiently limited and particular so as to pass constitutional muster because the items to be seized were reasonably

subject to identification) (quoting *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992)). In *Dickerson* the Fourth Circuit upheld a warrant authorizing a search for "evidence of . . . bank robbery." However, the Fourth Circuit acknowledged that a similar warrant would be constitutionally deficient where the "criminal statute or general criminal activity . . . provides no readily ascertainable guidelines for the executing officers as to what items to seize." *Id.* at 696. Here, the crime of larceny or burglary is not a crime that by its very nature makes readily ascertainable the items to be seized without knowing what types of items had been taken. However, in addition to identifying the type of crime being investigated the Sheriff's Office also identified the specific types of items they were seeking. ECF No. 16, attach. 1. In reviewing the warrant for constitutional validity using a common-sense approach required by precedent, the Court must view the "any and all items and evidence related to the crimes of larceny and burglary" language in context. This section of the warrant in its entirety states:

> 3. The things or persons to be searched for are . . . [a]ny and all items and evidence related to the crimes of larceny and burglary, to include but not limited to, cash, televisions and other electronic devices, power tools, outdoor equipment, chainsaws, firearms, ammunition, bows, binoculars, rods and reels, game cameras, various types of hunting equipment and sporting goods, camouflage clothing and household goods, and any and all similar items.

ECF No. 16, attach. 1. The language Defendant contests appears to be modified and limited by the language that follows and does not appear to authorize "a search for evidence . . . [that] provides no readily ascertainable guidelines for the executing officers as to what items to seize," which the Fourth Circuit has acknowledged is unconstitutionally overbroad and insufficiently particularized. *See Dickerson*, 166 F.3d at 696. The categorical limits of the search warrant appear appropriate under a "'standard of practical accuracy rather than technical precision.'" *United States v. Srivastava*, 540 F.3d 277, at 289 (4th Cir. 2008) (quoting *United States v. Angelos*, 433 F.3d 738,

745 (10th Cir. 2006)). "Any and all," as informed by several categories of items, is not the overbroad "general warrant to rummage through [Defendant's] home" that Defendant describes.[8] *See* ECF No. 16 at 8.

Defendant argues that the search warrant failed to name specific items to be seized even though Lt. Cobb had a list of items that Clarke reported stolen. *Id.* at 8-9. For a warrant to be sufficiently particular, a description of the items sought should prevent "the seizure of one thing under a warrant describing another." *Marron v. United States*, 275 U.S. 192, 196 (1927); *United States v. Robinson*, 275 F.3d 371, 381-82 (4th Cir. 2011), *cert. denied*, 535 U.S. 1006 (2001); *see also Groh v. Ramirez*, 540 U.S. 551, 557-63 (2004). However, as noted in *Dickerson*, the warrant need not provide a list of items, or even name any item or type of item, so long as the items sought can be identified with "reasonable certainty." 166 F.3d at 696. The Sheriff's Office was given a list of thirty-eight items stolen from Clarke, ranging from pop tarts and paper towels to a telescope. ECF No. 51 at 65, 67. Lt. Cobb explained that the categories used in the search warrant were created from the list Clarke had provided and encompassed all of Clarke's missing items, but also "overlap[ed] [with] items known to be missing from several of the break-ins [the Sheriff's Office was] investigating." *Id.* at 73, 122. While the Sheriff's Office provided broader categories of items rather than a specific list, these categories were sufficiently limited such that the Sheriff's Office was only permitted to search for and seize items related to burglary and larceny that were within the named categories, and that were known to them to be stolen. Therefore these categories of items in the search warrant are sufficiently particularized.

[8] While not specifically contested by Defendant, the language in the warrant of "and any and all similar items," *see* ECF No. 16, attach. 1, is permissible. *See United States v. Washington*, 852 F.2d 803, 805 (4th Cir. 1988) (finding that a search warrant with language permitting a search for categories of items "and other items of evidence" was sufficiently particularized).

Relatedly, Defendant contends that the warrant is not supported by probable cause because it does not limit the search exclusively to tools stolen from Clarke, which was the only type of property stolen from Clarke that was recovered upon Defendant's arrest. ECF No. 16 at 8-9. This argument is not well taken. Common sense commands that if Defendant possessed items, regardless of the type, taken during the Clarke burglary, then reasonable cause exists to believe that the Defendant likely possessed other items taken from that same burglary. Secondarily, Defendant argues that the warrant lacks probable cause because it does not limit the search to items stolen from the Clarke residence. *Id.* However, as the Government notes, the probable cause statement informs the magistrate that, while some of Clarke's belongings were found pursuant to Defendant's arrest, police also recovered other stolen items. *See Id.*, attach. 1. While Clarke was the most concrete and readily apparent victim of Defendant for purposes of the warrant, and serves a substantial basis for the warrant, his burglary was not the *sole* basis for the warrant as the probable cause statement suggests. *Id.* The probable cause statement also details the circumstances of Defendant's arrest—namely that he was caught breaking into a business. *Id.* It would be practically reasonable for the magistrate to find probable cause for stolen items that were not stolen specifically from Clarke. Thus, there is a "'substantial basis for . . . [the magistrate to] conclude that' probable cause existed" to search for items not strictly related to the Clarke burglary. *Gates*, 462 U.S. at 238-39 (quoting *Jones*, 362 U.S. at 271 (1960)).

Therefore, utilizing a common sense approach and giving the magistrate's probable cause determination great deference, *see Gates*, 462 U.S. at 236, the Court **FINDS** that the search warrant of Defendant's home is supported by probable cause to search for item not stolen specifically from Clarke. The Court further **FINDS** the warrant is sufficiently particularized, not

overbroad, and meets the minimum constitutional requirements for validity.

However, even if the Court were to find that the search warrant was Constitutionally deficient and invalid, the Government argues that the good faith exception applies.[9] ECF No. 19 at 20-23. The Defendant retorts that the good faith exception is inapplicable. ECF No. 16 at 10. Under the good faith exception to the exclusionary rule, a court may decline to exclude evidence obtained under a later-invalid search warrant if law enforcement's reliance on the warrant was objectively reasonable. *Leon*, 468 U.S. at 992; *Doyle*, 650 F.3d at 467. The rationale behind the good faith exception is best articulated in *United States v. Mayle*:

> "Generally, evidence seized in violation of the Fourth Amendment is subject to suppression under the exclusionary rule," *United States v. Andrews*, 577 F.3d 231, 235 (4th Cir. 2009), the purpose of which is to "deter future unlawful police conduct," *United States v. Calandra*, 414 U.S. 383, 347 [] (1974). The deterrence objective, however, "is not achieved through the suppression of evidence obtained by an 'officer acting with objective good faith' within the scope of a search warrant issued by a magistrate." [*United States v.*] *Perez*, 393 F.3d [457,] at 461 (quoting *Leon*, 468 U.S. at 920); *see United States v. Mowatt*, 513 F.3d 395, 404 (4th Cir. 2008) ("[I]t is the magistrate's responsibility to determine whether probable cause exists, and officers cannot be expected to second-guess that determination in close cases.").

383 F. App'x 329, 331-32 (4th Cir. 2010). "*Leon* teaches that a court should not suppress the fruits of a search conducted under the authority of . . . even a 'subsequently invalid' warrant unless 'a reasonably well trained officer would have known that the search was illegal despite the magistrate's authority." *United States v. Bynum*, 293 F.3d 192, 195 (4th Cir. 2002) (quoting *Leon*, 468 U.S. at 922 n.23). Searches conducted "pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that

[9] The Government also mentions that the harmless error doctrine would equally apply should the warrant be found invalid but provides no case law or analysis on this point, only mentioning it once in a conclusory manner. *See* ECF No. 19 at 22-23. Defendant did not respond to this conclusory statement and the Court need not address that argument.

a law enforcement officer has acted in good faith in conducting the search." *Id.* However, an officer's reliance on a warrant is never objectively reasonable, therefore making the good faith exception inapplicable, in four alternative circumstances:

> (1) when the issuing judge "was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth";
>
> (2) when "the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 60 L Ed. 2d 920, 99 S. Ct. 2319 (1979)";
>
> (3) when "an affidavit is so lacking in indicia of probable cause as to render official belief it its existence entirely unreasonable"; or
>
> (4) when "a warrant is so facially deficient – *i.e.*, in failing to particularize the place to be searched or thing to be seized – that the executing officers cannot reasonably presume it to be valid." *Leon*, 468 U.S. at 592.

*Perez*, 393 F.3d at 461 (internal alterations omitted); *accord Doyle*, 650 F.3d at 467; *United States v. Wellman*, 663 F.3d 224, 228-29 (4th Cir. 2011), *cert. denied*, 566 U.S. 953 (2012); *Andrews*, 557 F.3d at 236; *United States v. DeQuasie*, 373 F.3d 509, 519-20 (4th Cir. 2004); *United States v. Hyppolite*, 65 F.3d 1151, 1156 (4th Cir. 1995).

Defendant argues that the good faith exception does not apply because under the fourth circumstance "the state search warrant was facially deficient because it failed to particularize the things to be seized - i.e. the specific reported stolen items from Mr. Clarke." ECF No. 16 at 10. However, consistent with the Court's reasoning in Section III.A. *supra*, the warrant is not "*so* facially deficient . . . that the executing officers cannot reasonably presume it to be valid," in fact, the Court does not now find the warrant to be deficient at all. *Perez*, 393 F.3d at 461 (emphasis added). The Sheriff's Office took precautions to comply with search warrant requirements and

observe Defendant's Constitutional rights in executing the warrant.[10] *See* ECF No. 51 at 98-99, 119, 134, 137. Given the circumstances, the Court finds that the execution of the search warrant by the Sheriff's Office was reasonable and, even if the warrant were defective, the good faith exception would apply.[11]

B. The Search and Seizure of the Electronic Devices Was Lawful

In his second and fourth challenges, Defendant contends that the electronic devices seized by law enforcement were outside the scope of the search warrant, and the search of them was unlawful. This argument fails for three reasons: the seizure of the devices was within the scope of

[10] The Court views this in light of the circumstances as a whole, as the facts suggest that the Sheriff's Office fairly quickly upon a plain view of Defendant's residence realized the scope of their search would be amplified. *See* ECF No. 51 at 76, 80, 95-96. The Sheriff's Office took precautionary steps in an attempt to ensure Defendant's Fourth Amendment rights were observed. *Id.* at 98-99 (The Sheriff's Office sought a second search warrant to comply with the 72-hour warrant rule), 119 (The Sheriff's Office did not review the contents of the Pavilion computer that appeared in Defendant's regular use and ultimately got a warrant for that computer). Notably, Lt. Cobb implied that the Sheriff's Office conducted a warrantless search of several electronic devices found in Defendant's home because they believed those items were stolen and was looking for any indication of the rightful owner, they therefore thought Defendant had no privacy interest in those items that would give rise to the need for a warrant. *See Id.* at 119, 134 ("[S]o many items were identified . . . we were operating under the assumption that . . . [where] an item . . . fit the profile . . . it could have been stolen"), 137 (stating the thumb and hard drives "fit the criteria"). Defendant's privacy interest in these electronic devices and whether he has standing to challenge the warrantless search of these devices is discussed *infra* in Section B.

[11] Raised by the Court at the hearing is the question of what, if anything, in the affidavit or search warrant indicated that Defendant actually lived or was in any way connected to the address to be searched on Little Texas Road. *See* ECF No. 51 at 143. Responsively, Lt. Cobb testified "My assumption would be the Magistrate asked me some follow-up questions during the issuance of the warrant" as he states is typically done. ECF No. 51 at 143. The Court does not know what, if any, oral supplement Lt. Cobb gave the magistrate in addition to the information in his affidavit, but Lt. Cobb testified that he had visited this address before in attempts to speak with Defendant about the rash of burglaries, and had confirmed the address was Defendant's through, among other means, DMV records. ECF No. 51 at 60-61. Courts are not constrained to the four corners of a search warrant in assessing its validity and may consider the "totality of the information presented to the magistrate." *United States v. Legg*, 18 F.3d 240, 244 n.1 (4th Cir. 1994). Without first determining whether the absence from the affidavit of a declaration that Defendant lived at the address to be searched invalidates the search warrant, the Court believes that the good faith exception applies because Lt. Cobb knew and had verified that Defendant lived at the home ultimately searched on Little Texas Road, and nothing suggests that his omission was done in bad faith, but rather appears to be an unfortunate oversight. ECF No. 51 at 61; *See United States v. Campbell*, 2016 U.S. Dist. LEXIS at *7, 13-15 (finding the good faith exception applied where the affidavit for a search warrant that "on its face . . . offers scant evidence that [defendant] lived at the home" and did not explicitly identify "the location as [defendant's] home or otherwise connect the home with [defendant's alleged criminal activity] because it was "reasonable to believe that the items to be seized will be found in the place to be searched.").

the warrant, the search of them was lawful in order to determine ownership, and, in any event, Defendant lacks standing to assert any privacy interest in the devices.

1. *The Electronic Devices Were Not Seized Outside the Scope of the Search Warrant*

Defendant argues that the seizure of the Iomega hard drive, Transcend flash drive, and Pavilion computer was outside the scope of the search warrant and invalid because the Sheriff's Office was constrained to seize only electronic items that were on Clarke's list of stolen items, and no thumb or hard drives appear on that list. ECF No. 16 at 10-11. Defendant concludes that, because the Sheriff's Office seized these items based only on the belief they were stolen, and not because they were on Clarke's list of stolen items, they thereby exceeded the scope of the warrant. ECF No. 33 at 12. In response, the Government contends that the Sheriff's Office did not seize specific items not reported by Clarke to be stolen until after the second search warrant was obtained. ECF No. 19 at 12-13, and attach. 3 at 6. Defendant did not respond to this contention or make any argument that the Sheriff's Office exceeded the scope of the second search warrant. *See generally* ECF Nos. 16, 33. The Government relies heavily on and analogizes *Anglin v. Director, Patuxen Institution*, 439 F.2d 1342 (4th Cir. 1971), to the instant case, and discusses at length the "eerily similar" facts between them. ECF No. 19 at 13. The Government argues that the warrant supports the seizure of known stolen items unrelated to the Clarke burglary, but even if this evidence were outside the warrant, the Sheriff's Office could still lawfully seize all suspected contraband or stolen property under the plain view doctrine. *Id.* at 15.

The Court has addressed in Section III.A *supra* the breadth, limits, and validity of the search warrant and need not address that again here. The Iomega hard drive, Transcend thumb drive, and Pavilion computer all fall squarely within the search warrant's category of "televisions

and other electronic devices" language of the first and/or second search warrant.[12] However, Lt. Cobb testified that these items were not seized in connection with a specific identifiable burglary, but instead were seized because "[s]o many items were identified [as belonging to someone else]" that the Sheriff's Office began "operating under the assumption that . . . [where] an item . . . fit the profile [of being newer or of nicer quality]. . . it could have been stolen." ECF No. 51 at 134; *see also* ECF No. 51 at 95-96 ("Everything that appeared to be of a newer, nicer item, quality item, anything that wasn't broken or damaged . . . belonged to some other individuals that had reported those items as stolen . . . and we realized more likely than not these other items [not immediately identified] were going to be identified as belonging to somebody else at some point . . . we just didn't know who at that time"). Lt. Cobb testified that while a flash drive was reported stolen by one of the burglary victims, law enforcement was never able to tie the flash drive, hard drive, or computer at issue to any specific burglary or theft victim. *Id.* at 51, 53, 137. These items have never been connected to a particular victim or burglary, and thus it is not clear whether they were, in fact, stolen property. *Id.*

Defendant and the Government dispute the appropriateness of the Sheriff's Office's presumption that "[e]verything . . . of a newer, nicer item, quality item, anything that wasn't broken or damaged . . . belonged to some other individual . . . and [like] items [not immediately identified] were going to be identified as belonging to somebody else." *Id.* at 95-96. Defendant argues that, if law enforcement is to presume anything about who owns an item, they should presume everything in a defendant's home is that individual's property. *Id.* at 153. The Government concedes that this would be the typical default position of law enforcement, but argues that this is

[12] As stated in Section II, the first and second search warrants were substantially similar with only a few identifiable differences. *See* ECF No. 51 at 98-101.

not a typical case; given the circumstances, including the rash of similar burglaries and the sheer volume of stolen goods recovered, the Sheriff's Office appropriately assumed every "newer, nicer item, quality item" in Defendant's home was stolen. *Id.* at 95, 162.

*Anglin v. Director, Patuxen Institution*, 439 F.2d 1342, relied on the Government, supports the Government's position. ECF No. 19 at 13-15. In *Anglin*, Baltimore police "began surveillance of the Anglin residence, a house trailer, because [Morris Anglin] was known to them as a professional burglar and was then suspected of burgling the residence of Mr. and Mrs. Earnest Fox." 439 F.2d at 1343. The Baltimore police got a "search warrant describing generally, but with as much specificity as possible, [twenty-seven] items from the Fox break-in thought to be in the trailer." *Id.* at 1344. Upon execution of the warrant the defendant's wife, Mrs. Anglin, was presented with the warrant, read it, but not very carefully, . . . [and] assumed it authorized the seizure of all stolen property in the trailer which, other than furniture, appeared to be most of its contents." *Id.* "[R]eferring to the Fox burglary, the officers asked Mrs. Anglin to point out 'anything that she knew to be stolen * * * to simplify matters.'" *Id.* (alteration in original). "With Mrs. Anglin's help . . . the police [seized] over 700 items of property thought to have been stolen in numerous burglaries." *Id.* at 1345. The *Anglin* Court stated that the search warrant permitted the police "to enter Anglin's trailer and to search for the [twenty-seven] items of personal property particularly described in the warrant. Anglin may not properly complain of the search. He does complain of the seizure as a general seizure of property not particularly described in the warrant." *Id.* at 1346. The *Anglin* Court reasoned:

> [T]he officers were authorized entry upon the premises by the search warrant they had obtained and were duty bound to carry out their search in a thorough manner until the items listed in the warrant were found. We think the limits of the warrant were not exceeded by the officers despite the quantitative magnitude of the seizure

> as compared with the small number of items particularly described in the warrant. Anglin would have us read the search warrant as a constitutional strait jacket: that only those items particularly described in it may be seized without regard to the facts and circumstances of the particular case.

*Id.* Most pertinent to the instant case, the *Anglin* Court states:

> By virtue of the lawful warrant in their possession, the officers searching the Anglin trailer had a "right to be in the position" to observe the entire contents of the trailer. Those items seized were discovered in the course of a lawful search. The testimony of Sergeant Donovan indicates that, in fact, many of the items were . . . in plain view . . . . Once the privacy of the dwelling has been lawfully invaded, it is senseless to require police to obtain an additional warrant to seize items they have discovered in the process of a lawful search. "There is no war between the Constitution and common sense." *Mapp v. Ohio*, 367 U.S. 643, 657, 81 S. Ct. 1684, 1693, 6 L. Ed. 2d 1081 (1961). To so hold would again tempt the police to proceed without a warrant . . . . If the search has not extended beyond the scope of the warrant and the officers chance upon items which they would have had probable cause to seize . . . , we think it serves the Fourth Amendment well to allow the seizure of those items for use as evidence at trial. *See, United States v. Eagleston*, 417 F.2d 11 (10th Cir. 1969); *United States v. Teller*, 412 F.2d 374 (7th Cir. 1969).

*Id.* at 1347-48. The *Anglin* Court incorporated the rationale of the Court of Special Appeals of Maryland in an earlier holding about the reasonableness of the enlarged seizure:

> ["]The articles seized were of the same nature and substance as those described in the warrant. With this knowledge and confronted with the great array of merchandise, literally enough to stock a store, we do not feel that justice requires the police officers to close their minds and eyes. We think there was more than reasonable cause for them to believe the property was stolen. Appellant maintains that he could have been a watch salesman or clothing salesman or that there are other logical explanations to account for the property other than it was stolen. We think this incredible under the circumstances as did the trial court.["]

*Id.* at 1349 (quoting *Anglin v. State*, 1 Md. App. 85, 91, 227 A.2d 364, 367 (1967)). Defendant did not contest the applicability of *Anglin* or draw any distinctions between it and the instant circumstance. *See generally* ECF Nos. 16, 33.

Given that the facts of *Anglin* are consistent with the instant case and the rationale of the *Anglin* Court persuasive, the undersigned must conclude that the Imogen hard drive, Transcend

thumb drive, and Pavilion computer were not seized outside the scope of the search warrant.

2. *The Search of the Electronic Devices to Determine Ownership Thereof Was Lawful*

Defendant contends that the Sheriff's Office conducted a warrantless search of Defendant's electronic devices and no exception to the warrant requirement applies. ECF Nos. 16 at 12-15 and 33 at 12-15. The Government concedes that Lt. Cobb's search of the hard drive and flash drive[13] was warrantless, but argues that, given the sheer volume of stolen property located at the residence, he was justified in reviewing these devices to determine their rightful owner. ECF No. 19 at 18-20.

Under the rationale of *Riley v. California*, 134 S. Ct. 2473, 2485 (2014) (holding that "officers must generally secure a warrant before conducting . . . a search" of "data on cell phones") and related cases, a defendant does have a reasonable expectation of privacy in his personal computer, and this is a privacy right that society is prepared to recognize. *See United States v. Darby*, 190 F. Supp. 3d 520, 529, 537 n.8 (E.D. Va. 2016) (citing *Riley*, 134 S. Ct. at 2485 and *Guest v. Leis*, 255 F.3d 325, 333 (6th Cir. 2001)); *see also United States v. Shah*, 2015 U.S. Dist. LEXIS 826, at *43-45 (E.D.N.C. Jan. 6, 2015) (inferring in its explanation of the search warrant requirements for electronic storage devices under Fed. R. Crim. P. Rule 41(e)(2)(B) that there is an expectation of privacy in such devices giving rise to the need for a warrant of the electronic data therein). Under this premise, the Court is satisfied that a defendant generally has a reasonable expectation of privacy in the stored information on his personal electronics, including hard drives

[13] Lt. Cobb testified at the hearing that the Pavilion computer was seized under the first search warrant but never accessed by the Sheriff's Office. ECF No. 51 at 119-20. The Pavilion computer instead was only searched pursuant to a federal search warrant, ECF No. 16, attach. 7. Defendant did not contest this fact. Consequently, the Court's analysis is limited to whether an exception exists to excuse the warrantless search of the Iomega hard drive and Transcend flash drive.

and flash drives.

As the Government observes, the instant case presents a unique set of circumstances not usually associated with search warrants of electronic devices. ECF No. 19 at 18. Further, the Government does not argue that an exception to the warrant requirement exists, but rather contends that Lt. Cobb reasonably, even if wrongfully, believed his exploration of these items was outside the scope of Fourth Amendment entirely. *Id.* The Government argues that in looking at the electronic content, Lt. Cobb reasonably believed that the hard drive and flash drive were stolen, and therefore he was reasonable in concluding Defendant had no expectation of privacy in these items that would give rise to the need for a warrant. *Id.* at 18-19. The Court finds this argument persuasive.

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. However, the Fourth Amendment guarantees "no such search will occur that is 'unreasonable.'" *Illinois v. Rodriguez*, 497 U.S. 177, 183 (1990) (holding evidence not be suppressed where an officer entered defendant's home with the consent of a third party he reasonably believed had apparent authority to consent to a search but did not have actual authority to do so). "'[R]easonableness" . . . does not demand that the government be factually correct in its assessment that that is what a search will produce. Warrants need only be supported by "probable cause," which demands no more than a proper "assessment of the probabilities in particular factual contexts.'" *Id.* at 184 (quoting *Gates*, 462 U.S. at 232). The undersigned concluded in Section III.B.1 *supra*, that the Sheriff's Office did not act unreasonably, given the unique circumstances, to assume that everything "newer, nicer item, quality item" in Defendant's home was stolen

consistent with the rational articulated by *Anglin*. *See generally Anglin*, 439 F.2d 1342. This rationale logically extends to whether the Sheriff's Office reasonably believed the Imogen hard drive and Transcend thumb drive were stolen. A defendant has no expectation of privacy in the contents of stolen electronics in his possession. *See United States v. Caymen*, 404 F.3d 1196, 1120 (9th Cir. 2005); *United States v. Lyons*, 992 F.2d 1029, 1031-32 (10th Cir. 1993). Even now, over four years later, it is unclear whether the Sheriff's Office was "actually correct" in its belief that these items were stolen.[14] *Rodriguez*, 497 U.S. at 184. Therefore, the Court **FINDS** that, while no exception to the warrant requirement exists in this case, the Sheriff's Office was reasonable in its belief that the Imogen hard drive and Transcend flash drive were stolen, and therefore their review of its contents to determine the ownership thereof was reasonable and therefore not in violation of the Fourth Amendment. U.S. Const. amend. IV (noting again that the Fourth Amendment only protects "against *unreasonable* searches and seizures") (emphasis added).

3. *Defendant Lacks Standing to Challenge the Search of the Electronic Devices*

The Government argues that Defendant lacks standing to challenge the search and admissibility of the contents of the Iomega hard drive, Transcend flash drive, and Pavilion computer because Defendant cannot demonstrate any of the subject devices belonged to him.[15] ECF No. 19 at 15. Defendant did not respond to the Government's standing challenge in any of his briefs in support of Defendant's First Motion to Suppress. *See* ECF Nos. 16, 33; *see also* ECF No. 37 at 1 ("the [D]efendant has had two opportunities to formally address this issue in a reply to

---

[14] This is because Defendant has not made a factual showing of his interest in these electronic devices nor has any victim of burglary or larceny come forward to claim them. ECF No. 51 at 51, 53, 137.

[15] The Government specifically challenges Defendant's privacy interest in the electronic devices only and does not challenge Defendant's privacy interest in the Notebooks, ECF No. 16, attach. 6. *See* ECF Nos. 19 at 15-18 and 37 at 1-2.

the Government's original response or in the Supplemental Motion, but failed to do so.").

"The proponent of a motion to suppress has the burden of establishing that his own Fourth Amendment rights were violated by the challenged search or seizure." *Rakas v. Illinois*, 439 U.S. 128, at 130 n.1 (1978); *accord United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981). A criminal defendant "does not have standing to contest the search of a third party unless he can show he had a reasonable expectation of privacy in the area searched or the property seized." *United States v. Al-Talib*, 55 F.3d 923, 930 (4th Cir. 1995) (citing *United States v. Payner*, 447 U.S. 727, 731 (1980); *Rakas*, 439 U.S. at 133-34. "The privacy interest that must be established to support standing is an interest in the area searched, not an interest in the items found." *United States v. Manbeck*, 744 F.2d 360, 374 (4th Cir. 1984) (citing *Rawlings v. Kentucky*, 448 U.S. 98, 104-06 (1980); *United Sates v. Salvucci*, 448 U.S. 83, 91-93 (1980); *United States v. Ramapuram*, 632 F.2d 1149, 1154 (4th Cir. 1980), *cert. denied*, 450 U.S. 1030 (1981)).

To evaluate a defendant's reasonable expectation of privacy in an item of property, courts consider "whether that person claims an ownership or possessory interest in the property." *United States v. Rusher*, 966 F.2d 868, 875 (4th Cir. 1992) (citing *Rawlings*, 448 U.S. at 105-106 (1980)). "A person who is aggrieved by an illegal search and seizure only through the introduction of damaging evidence secured by a search of a third person's premises or property has not had any of his Fourth Amendment rights infringed." *Id.* (citing *Alderman v. United States*, 394 U.S. 165, 174 (1969)). Where a person exerts dominion and control over another's property they may retain a privacy interest consistent with his rightful possession or control of that property. *See Id.*; *United States v. Avagyan*, No. 3:15cr155, 164 F. Supp. 3d 864, 879 (E.D. Va. 2016); *United States v. Austin*, 2018 U.S. Dist. LEXIS 104556, at *7 (D.S.C. June 22, 2018). However, one who is

"unlawfully in possession of [another's property] has no right to object to its search" and lacks standing to challenge the search of the property to the extent their possession of the property is unlawful. *Dickerson*, 655 F.2d at 561. Ultimately, "the law requires that the court determine whether the defendant at the time of the search had a reasonable expectation of privacy that society is prepared to recognize as legitimate." *Austin*, 2018 U.S. Dist. LEXIS 104556 at *8.

At the hearing, Defendant argued that the Government was required to show that Defendant did ***not*** have a privacy interest in the seized items in order to demonstrate a lack of standing. ECF No. 51 at 151-52. However, it is Defendant's burden to show that he has a Constitutionally protected interest after he is put on notice of a standing challenge. *See United States v. Castellanos*, 716 F.3d 828, 833 n.4 (4th Cir. 2013) (Finding that because defendant was put on notice of a standing challenge by the government's brief, the defendant bore the burden of proof to establish he had standing to seek the suppression of evidence and failed to carry that burden because he did not put on any evidence of his privacy interest or respond to the government's legal arguments). Despite not addressing this issue in his briefs at the hearing Defendant did contend that he had standing to assert a privacy interest, but claimed that to assert an ownership or possessory interest in the property (as required by *Rawlings*, 448 U.S. 98, and *Rusher*, 966 F.2d 868), would force him into an untenable dilemma. ECF No. 51 at 153-55. Specifically, Defendant argued that the only means Defendant could assert an ownership interest in the electronic devices, and thus establish standing, would be to take the stand, thereby potentially incriminating himself in violation of his Fifth Amendment rights. *Id.* at 154-55. However, this argument is misguided, as courts have recognized and resolved this conundrum. *See Dickerson*, 655 F.2d at 562. To the extent that evidence external to a defendant does not exist, "when a defendant testifies in support

of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on issues of guilt unless he makes no objection." *Id.* (internal quotations omitted) (quoting *Simmons v. United States*, 390 U.S 377, 394 (1968)).

While Defendant has repeatedly made conclusory statements that he has a Fourth Amendment privacy interest in the electronics at issue, Defendant has failed to put forth *any evidence* in support of that legal conclusion. ECF Nos. 16, 33, 51 at 146 (responding "no" when the Court asked if Defendant had any evidence to present at the suppression hearing). Therefore, Defendant has failed to carry his burden and establish standing, since standing was contested by the Government. *See Castellanos*, 716 F.3d at 833 and 833 n.4 (holding that the defendant "failed to demonstrate by a preponderance of the evidence that, at the time of the search, the evidence showed that he had a legitimate expectation of privacy" because the defendant "made no effort to prove his standing" at the suppression hearing or "rebut the government's argument that he had none."). Because Defendant has failed to carry his burden to prove that he had a legitimate expectation of privacy in the evidence in question, the Court **FINDS** that Defendant does not have standing to challenge the search and seizure of the Iomega hard drive, Transcend flash drive, or Pavilion computer.

C. The Search and Seizure of the Notebooks Violated Defendant's Constitutional Rights Under the Fourth Amendment

Defendant contends that the Sheriff's Office recovered and searched "multiple spiral-bound notebooks, legal pads, and other papers" which was beyond the scope of the warrant, and which contained purportedly incriminating information related to Defendant's instant charges. ECF No. 16 at 19 and attach. 6. Defendant argues that the Notebooks did not specifically pertain to the Clarke burglary, that neither the first or second search warrant authorized the search or

seizure of the Notebooks, and that the Sheriff's Office lacked probable cause to search those items because evidence sought pursuant to the search warrant—items related to the Clarke burglary—could not possibly be found within the Notebooks. *Id.* In his brief Defendant relied on the rationale of *United States v. Jaimez*, 15 F. Supp. 3d 1338 (N.D. Ga. 2013), which held that six notebooks seized in a consent search for drugs and weapons were outside the scope of defendant's consent, and the plain view doctrine did not apply. Lt. Cobb testified that he believed his search of the Notebooks was properly within the warrant under "any and all evidence of larceny and burglary." As stated in Section III.A. *supra*, the language "evidence of larceny and burglary" is permissible because it is informed by the categories of items listed in the warrant. *See Dickerson*, 166 F.3d at 696. A search for evidence of larceny or burglary that is not subsumed within the warrant's categories falls outside the scope of the warrant. *Id.*

The Government contended in its brief that Notebooks fit within the "household goods" category of the search warrant, and since the search and seizure of these items was consistent with the conclusion of the Sheriff's Office that nearly everything in Defendant's home was stolen, their review of its contents was appropriate. ECF No. 19 at 23-24. As a result, the Government argues, once the Sheriff's Office saw the notebook page at issue, which indicated potential evidence of child exploitation, they were justified in seizing this evidence. *Id.* at 24. However, while this theory may justify a seizure of the Notebooks it does not justify Lt. Cobb's exploration into their contents. At the hearing, the Government provided a further explanation as to why the search of the notebook was justified: Lt. Cobb was justified in going through the Notebooks to search between the pages for cash, which, as an item stolen during the aforementioned burglaries, could have been secreted between the pages. ECF No. 51 at 167 ("I would submit to the Court that it's

completely proper to find, if you're looking for things of that nature, to go through a notebook and look for things . . . [like cash] it would be very easy to slip cash in a notebook. So if they're looking for cash -- and that was one of the things that was authorized under the warrant -- then I don't think there would be any problem at all for them to page through the pages of a notebook to see if any cash had been stashed in there."). However, upon recall to the stand to address the search and seizure of the Notebooks, Lt. Cobb specifically disavowed this explanation of why he searched through the contents of the Notebooks. Lt. Cobb testified that he noticed one "notebook in particular had something on the front or the top page, and [he] just began to look through the notebooks." *Id.* at 170. Lt. Cobb testified that he could not recall what he saw on the top or front page of the Notebooks that prompted his review of the contents, but explicitly stated that his motive for looking through them was "specifically [to find] incriminating writings." *Id.* at 169-71.[16] Thus, because Lt. Cobb was not searching in hopes of finding evidence identified in the categories of the warrant, his search of the Notebooks' contents falls outside the warrant's authorization.

Here, Lt. Cobb did not contend that he believed the Notebooks to be stolen and reviewed the Notebooks' contents because he was trying to determine their owner, as he did with the electronic devices, but instead states that that he did so to look for incriminating written evidence. The warrant authorized by the magistrate entitled the Government to search and seized categories of evidence related to the crimes of burglary and larceny, however, this is modified and limited by specific categories of items. While the Notebooks may have been stolen in a burglary, a search of their content is no less protected than the search of the contents of the computer or electronic

[16] After Lt. Cobb's testimony, the Government retracted its presumption that Lt. Cobb was looking for money in the Notebooks. *Id.* at 171 ("[M]y speculation was wrong; that Detective Cobb was not looking for stuff that could be in [the Notebooks].").

storage device found in Defendant's home, in that Notebooks may contain the same type of personal data, only in written, not digital, format. The Court has previously found that search of the electronic devices was lawful absent a search warrant because, as an item that fit the description of the stolen property, determining its possible ownership by reviewing its contents was not unreasonable. That earlier analysis applies with equal force here. With respect to the Notebooks, however, the Government has not contended that Lt. Cobb's warrantless search of the contents is saved because his search was reasonable and meant to determine ownership. Instead, Lt. Cobb admitted he reviewed the contents in order to find incriminating evidence. The Fourth Amendment does not countenance such fishing expeditions absent a warrant. *See Acevedo*, 500 U.S. at 580 (noting that searches absent a warrant are *per se* unreasonable). Because the search of the Notebooks' contents was conducted outside the scope of the search warrants for Defendant's home, a second search warrant—as is the case with the electronics—was required to search the contents. Therefore, in order for Notebook evidence to be admissible the Government must show some exception to the warrant requirement applies.

Notably, with respect to the electronic devices, the Court found that the Defendant did not have standing to challenge the search, because once the Government put in issue the question of standing, it was Defendant's burden to establish an ownership or possessory interest. *See Castellanos*, 716 F.3d at 833 n.4. By contrast, the Government here did not challenge Defendant's standing to assert a privacy interest in the Notebooks; consequently, it was not necessary for him to assert such ownership or possessory interest in the Notebooks, and it became incumbent upon the Government to demonstrate why its search was lawfully within the scope of the warrant, or otherwise subject to some exception, such as good faith or plain view. *See Steagald v. United*

*States*, 451 U.S. 204, 209 (1981); *United States v. Williams*, 1995 U.S. App. LEXIS 21649, at *6 n.2 (Aug. 10, 1995). However, neither good faith nor plain view saves the Government here.

As discussed in Section III.A *supra*, for the good faith exception to apply, law enforcement's reliance on a later-invalid warrant must have been objectively reasonable. *Leon*, 468 U.S. at 992; *Doyle*, 650 F.3d at 467. As a threshold matter, the warrant in the instant case has not been invalidated, therefore, the good faith exception does not squarely apply so as to save any conduct by Lt. Cobb that may violate the Fourth Amendment. The Fourth Amendment specifically protects the "right of the people to be secure in their persons, houses, ***papers***, and effects against unreasonable searches and seizures." U.S. Const. amend. IV (emphasis added). Here, the warrant admittedly authorized the seizure of "household goods." However, Lt. Cobb's motivation was not to find anything specified in the warrant. Rather, Lt. Cobb admits to searching for written evidence of criminal activity. Lt. Cobb did not testify that he had probable cause to believe such evidence existed within the Notebooks, and the crime of larceny or burglary is not ordinarily the type of crime for which written evidence is often located in such a place, so that a reasonable officer would believe this kind of documentary evidence would be found there. Thus, Lt. Cobb's reliance on the warrant to read through the Notebooks in search of incriminating writings was not objectively reasonable, and clearly did not authorize the type of search Lt. Cobb conducted here.

Defendant argues that the plain view doctrine does not apply to the Notebooks because the "incriminating nature" of a notebook is not "immediately apparent." ECF No. 16 at 20. For the plain view doctrine to apply, the Government must show that: (1) the officer was lawfully in a place from which the object could be viewed; (2) the officer had a lawful right of access to the seized items; and (3) the incriminating character of the items was immediately apparent. *See*

*United States v. Davis*, 690 F.3d 226, 233 (internal quotations omitted) (quoting *United States v. Jackson*, 131 F.3d 1105, 1109 (4th Cir. 1997)). Defendant contends the plain view doctrine is inapplicable because the incriminating nature of a notebook is not readily apparent on its own and absent some additional probable cause. ECF No. 33 at 22. Because Defendant appears to only contest the third prong of the plain view doctrine, the Court shall address only this prong.

At the hearing Lt. Cobb testified that he noticed one "notebook in particular had something on the front or the top page, and [he] just began to look through the notebooks," ECF No. 51 at 170, and further testified that he could not recall what information he saw on the top or front page of the Notebooks that prompted his review of the contents, *Id.* at 169-71. Counsel for the Government concurred, stating that he could submit a supplemental exhibit to evidence what Lt. Cobb saw on the front or top page that prompted his exploration of the Notebooks. *Id.* at 171. To date, no such supplement has been provided nor is there any indication that such a supplement is forthcoming. The burden is on the Government to show that the plain view doctrine is satisfied. *Davis*, 690 F.3d at 233. The Government has failed to provide evidence, as Defendant notes, that the Notebooks had any immediately apparent incriminating character. Absent the support of evidence, the Court cannot speculate as to what Lt. Cobb saw or did not see that prompted his exploration of the contents of the Notebooks. Thus, the Government has failed to satisfy its burden under the third prong of the plain view doctrine.

D. Only the Evidence Obtained from the Search of the Notebook Should Be Excluded Under the Fruit of the Poisonous Tree Doctrine

When evidence is discovered as a result of a Fourth Amendment violation it is generally subject to suppression as the fruit of that violation. *Andrews*, 577 F.3d at 235. However, not all evidence discovered as a result of a Fourth Amendment violation is inadmissible at trial as "fruit

of the poisonous tree;" rather evidence obtained from an illegal search may be admissible depending on "whether, granting establishment of the primary illegality of the evidence to which the instant objection is made has been come at by exploitation of that illegality, or instead by means sufficiently distinguishable to be purged of that primary taint." *Wong Sun*, 371 U.S. at 488 (internal citations omitted). Thus, when there is sufficient attenuation between the unlawful search and the acquired evidence, that evidence may still be admissible to the extent is has been purged of the taint of the unlawful search. Courts consider several factors in determining attenuation, including: (1) the amount of time between the illegal action and the acquisition of the evidence; (2) the presence of the intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 603-04 (1975).

The undersigned has determined that only the evidence derived from the search of the Notebooks constitutes evidence seized in violation of Defendant's constitutional rights under the Fourth Amendment. The Government has not argued that any of the aforementioned exceptions to the fruit of the poisonous tree doctrine apply, and the undersigned **FINDS** that they do not. At the same time, suppression of the notebook page does not require exclusion of any other evidence. *United States v. Robinson*, 275 F.3d 371, 381 (4th Cir. 2001) (holding that when some items not identified in a warrant are improperly seized, suppression of items validly seized is generally not necessary). Accordingly, the undersigned **RECOMMENDS** the evidence seized by the Government in their search of the Notebooks be suppressed and excluded from evidence.

## IV. CONCLUSION

The undersigned **FINDS** as follows:

(1) The search warrant authorizing the Sheriff's Office to search Defendant's home was not overbroad or insufficiently particularized;

(2) The search and seizure of the electronic devices, specifically the Iomega hard drive, Transcend flash drive, and Pavilion computer, were lawfully within the scope of the warrant;

(3) Defendant lacks standing to challenge the search of the content of the electronic devices;

(4) The search and seizure of the Notebooks violated Defendant's constitutional rights under the Fourth Amendment; and

(5) The evidence seized as a result of the search of the Notebooks should be suppressed pursuant to fruit of the poisonous tree doctrine.

## V. RECOMMENDATION

For the reasons stated herein, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress, ECF No. 16, be **GRANTED** to the extent that evidence seized from the Notebooks should be suppressed and excluded from evidence, and **DENIED** in all other respects.

## VI. REVIEW PROCEDURE

By receiving a copy of this Report and Recommendation, the parties are notified that:

1. Any party may serve on the other party and file with the Clerk of this Court specific written objections to the above findings and recommendations within fourteen days from the date this Report and Recommendation is mailed to the objecting party, *see* 28 U.S.C. § 636(b)(1). A party may respond to another party's specific written objections within fourteen days after being served with a copy thereof. *Id.*

2. The United States District Judge shall make a *de novo* determination of those portions of this Report and Recommendation or specified findings or recommendations to which objection is made. The parties are further notified that failure to file timely specific written objections to the above findings and recommendations will result in a waiver of the right to appeal from a judgment of this Court based on such findings and recommendations. *Thomas v. Arn*, 474 U.S. 140 (1985); *Carr v. Hutto*, 737 F.2d 433 (4th Cir. 1984), *cert. denied*, 474 U.S. 1019 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984), *cert. denied*, 467 U.S. 1208 (1984).

The Clerk is **DIRECTED** to forward a copy of this Report and Recommendation to counsel of record for the parties.

Lawrence R. Leonard
United States Magistrate Judge

Norfolk, Virginia
December 10, 2018